UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| COLORADO WILD HORSE AND BURRO COALITION, INC., *et al.*, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Civil Action No. 10-1645 (RMC) |
| KENNETH LEE SALAZAR, Secretary, U.S. Department of the Interior, *et al.*, | ) ) ) ) ) | |
| Defendants. | ) ) | |

**MEMORANDUM OPINION**

Plaintiffs challenge the validity of the Bureau of Land Management's ("BLM") decision in 2005 to remove a herd of wild horses west of Douglas Creek in Colorado, on the basis that the decision violates the Wild Free-Roaming Horses and Burros Act ("Wild Horse Act"), 16 U.S.C. § 1331 *et seq.*[1] The Court will dismiss the case because it is not yet ripe for judicial review.

Congress adopted the Wild Horse Act in 1971 and entrusted BLM, an agency within the U.S. Department of the Interior, with responsibility for guarding and maintaining wild free-roaming horses in the American West. The Wild Horse Act provides that "[i]t is the policy of Congress that wild free-roaming horses and burros shall be protected from capture, branding, harassment, or death; and to accomplish this they are to be considered in the area where presently found, as an integral part of the natural system of the public lands." *Id.* § 1331. It is a

---

[1] Plaintiffs also allege that the decision violates the Federal Land Policy and Management Act of 1976, 43 U.S.C. § 1701 *et seq.*

violation of federal law to remove a wild free-roaming horse or burro from public lands, convert a wild free-roaming horse or burro to private use, or kill or harass a wild free-roaming horse or burro. *See id.* § 1338(a)(1)-(3). Tasked with "protect[ing] and manag[ing] wild free-roaming horses and burros," the Secretary is authorized to "make determinations as to whether and where an overpopulation exists and whether action should be taken to remove excess animals." *Id.* §§ 1333(a), 1333(b)(1). The term "excess animals" is defined as "wild free-roaming horses or burros (1) which have been removed from an area by the Secretary pursuant to applicable law or, (2) which must be removed from an area in order to preserve and maintain a thriving natural ecological balance and multiple-use relationship in that area." *Id.* § 1332(f). Section 1333(b)(2) specifically provides an "order and priority" for the removal of excess animals, starting with the old, sick, or lame, to protect the land necessary to sustain an existing herd or herds of animals, within their known territorial limits, which is "*devoted principally but not necessarily exclusively to their welfare in keeping with the multiple-use management concept for the public lands*," *id.* § 1332(c) (emphasis added).

As relevant here, BLM initially identified two separate "herd units" in northwestern Colorado, known as the Douglas Creek Herd Unit and the Piceance Basin Herd Unit, located on either side of a ridge called Cathedral Bluffs. Both herd units are located within BLM's White River Resource Area ("WRRA"). In February 1975, BLM conducted its first Unit Resource Analysis[2] that included the Douglas Creek area. It noted that the primary land use for the local economy was the oil and gas industry and that no forage had been allocated to wild

---

[2] A Unit Resource Analysis is an inventory and analysis of resources within a planning unit.

horse use. A.R. Vol. 4, Tab 14, p. 379.[3] The White River Field Office prepared a Management Framework Plan[4] for the WRRA in that same year and determined that conditions were not suitable for managing a population of wild horses west of Douglas Creek (the "West Douglas Herd"). It concluded that the West Douglas Herd should be removed because "[t]he increase in oil and gas activities in this area . . . is causing horses to disperse into areas where they did not exist prior to 1971." A.R. Vol. 4, Tab 12, p. 248. In other words, as early as 1975, the "known territorial limits" of the range for wild horses in the West Douglas Herd Area were *not* devoted principally to the welfare of the horses. Rather, BLM's decision was to remove the horses to allow continued oil and gas development.

The 1975 decision was not acted upon but was also not changed upon review in 1981 and 1997. Still BLM took no actions to remove the wild horses. On August 29, 2005, BLM's White River Field Office issued a proposed Decision Record and a Finding of No Significant Impact[5] ("2005 Decision Record") that again recommended a total removal of the wild horses from the West Douglas Herd Area by 2007. A.R. Vol. 1, Tab 54, p. 360. The Colorado State Director approved this recommendation on October 10, 2007, directing that all

---

[3] The administrative record citations in this Opinion refer to the administrative record from Case No. 06-1609. In a Minute Order (July 19, 2011), the Court deemed the administrative record from Case No. 06-1609 to be part of the administrative record in this matter.

[4] A Management Framework Plan is a framework for managing multiple land uses in an area.

[5] The proposed Decision Record and a Finding of No Significant Impact constitute a West Douglas Herd Area Amendment to the White River Resource Management Plan. A.R. Vol. 1, Tab 54, p. 360. Under the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq.*, any "major Federal actions significantly affecting the quality of the human environment" require the preparation of an environmental impact statement (EIS). *Id.* § 4332(C). "An agency can avoid preparing an EIS if it issues a proper Finding of No Significant Impact ("FONSI")." *Sierra Club v. Van Antwerp*, 661 F.3d 1147, 1153 (D.C. Cir. 2011).

horses be removed from the West Douglas Herd Area "at the earliest practicable date." A.R. Vol. 1, Tab 12, p. 71.

This time, the White River Field Office moved promptly to propose a gather of the wild horses in the West Douglas Herd Area in 2008. Upon Plaintiffs' suit, this Court ruled that the 2008 Gather Plan[6] exceeded BLM's jurisdiction because "[a] prerequisite to removal under the Wild Horse Act is that BLM first determine that an overpopulation exists and that the wild free-roaming horses and burros slated for removal are 'excess animals.'" *CWHBC I*, 639 F. Supp. 2d at 97-98. This Court reasoned:

> [BLM] protest[s] that because wild free-roaming horses will continue to inhabit the Piceance-East Douglas Herd Management Area, BLM's decision to remove the West Douglas Herd will not result in the removal of all the horses historically found in the Douglas Creek wild horse herd unit. . . . The argument misses the point. [BLM] admit[s] that "[t]he area of wild horse use at the passage of the Act was an area of 187,970 acres known as the 'Douglas Creek wild horse herd unit,'" and that the herd unit encompassed the area that the West Douglas Herd now inhabits. . . . [Management of horses in the Piceance-East Douglas HMA] does nothing to remedy BLM's lack of statutory authority to remove non-excess animals historically found in the Douglas Creek herd unit, including the West Douglas Herd Area.

*Id.* BLM is also required to remove the old, sick, and lame horses first, *see* 16 U.S.C. § 1333(b)(2)(A), and, implicitly, remove only the number of horses that are needed to protect the land in a herd's traditional area for their "principal[]" but not exclusive use, *id.* § 1332(c).

Thereafter, when BLM proposed a new gather of wild horses in the West Douglas Herd Area in 2010, Plaintiffs filed this suit. In February 2011, BLM withdrew its 2010 proposal for a gather. *See* Notice of Withdrawal of September 3, 2010 Decision [Dkt. 27] & Ex. 1. The

---

[6] The Court labeled the 2008 West Douglas Herd Area Wild Horse Removal Final Decision Record and Environmental Assessment the "2008 Gather Plan." *Colo. Wild Horse & Burro Coal., Inc. v. Salazar*, 639 F. Supp. 2d 87, 90 (D.D.C. 2009) ("*CWHBC I*").

parties now dispute whether the Court should invalidate the 2005 Decision Record, approved in 2007, and declare that BLM has no authority to zero out the West Douglas Herd or any other herd of wild horses. BLM urges the Court to dismiss this case because, *inter alia*, it is not ripe for review.[7]

Jurisdiction requires that a claim be ripe for decision. *See Nat'l Park Hospitality Ass'n v. Dep't of Interior*, 538 U.S. 803, 808 (2003) ("The ripeness doctrine is drawn both from Article III limitations on judicial power and from prudential reasons for refusing to exercise jurisdiction." (internal quotation marks and citations omitted)). By requiring that claims be ripe before adjudicating them, courts promote judicial economy, avoid becoming entangled in abstract disputes, and ensure a record adequate to support an informed decision when a case is heard. *Abbott Labs. v. Gardner*, 387 U.S. 136, 148-49 (1967), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977). To show that a claim is ripe, a plaintiff must demonstrate: (1) the fitness of the issues for judicial decision, and (2) the hardship to the parties caused by withholding court consideration. *Nat'l Treasury Emps. Union v. Chertoff*, 452 F.3d 839, 854 (D.C. Cir. 2006) (citing *Abbott Labs.*, 387 U.S. at 149). In a case with circumstances similar to those here, the Supreme Court resolved a ripeness challenge by considering: "(1) whether delayed review would cause hardship to the plaintiffs; (2) whether judicial intervention would inappropriately interfere with further administrative action; and (3) whether

---

[7] The Court issued a Minute Order (June 24, 2011) after the withdrawal of the 2010 gather plan, concluding that "BLM's recent withdrawal of its decision to gather the herd in 2010 does not effect any change to the allegedly improper decision to eliminate the herd as soon as practicable" and directed the parties to proceed with briefing. Although the Court found that withdrawal of the 2010 gather plan did not render Plaintiffs' challenge to the 2005 Decision Record moot, it concludes that in the absence of a specific gather plan, the 2005 Decision Record is not ripe for review.

the courts would benefit from further factual development of the issues presented." *Ohio Forestry Ass'n v. Sierra Club*, 523 U.S. 726, 733 (1998).

BLM argues that the 2005 Decision Record does not authorize any particular site-specific action and that any future decision to gather horses in the West Douglas Herd will be preceded by a gather plan, which requires an environmental review under NEPA and a separate decision record. Plaintiffs contend that the decision is ready for review because BLM's prior attempts to gather the horses demonstrate that BLM refuses to recognize its obligations to wild horses and that the Court must order it to do so. The problem, of course, with BLM's general argument is that the 2005 Decision Record, approved in 2007, very specifically authorized the removal of all horses from the West Douglas Herd Area, an authorization upon which the White River Field Office tried to execute in 2008 and 2010. Nonetheless, the Court concludes that the Complaint should be dismissed on ripeness grounds.

First, deciding not to rule on the 2005 Decision Record at this time will not result in hardship to Plaintiffs. Given that BLM must complete an environmental assessment and propose a separate decision record before any gather of horses in the West Douglas Herd, the 2005 Decision Record has no immediate effect. If BLM issues a new gather plan, Plaintiffs "will have ample opportunity later to bring [their] legal challenge at a time when harm is more imminent and more certain."[8] *Id.* at 734.

---

[8] Plaintiffs allege that they will experience economic hardship as a result of delay because they must maintain a constant flow of funds to monitor BLM. Assuming arguendo that this alleged harm constitutes the type of hardship relevant to a ripeness analysis, it does not outweigh the other ripeness considerations. *See Mount Wilson FM Broadcasters, Inc. v. FCC*, 884 F.2d 1462, 1467 (D.C. Cir. 1989) ("Unless the 'hardship to the parties of withholding court consideration' outweighs the other factors, we should dismiss this appeal." (quoting *Abbott Labs.*, 387 U.S. at 149)).

6

Second, a decision now would interfere with further administrative action because BLM still can and, in fact, must, make an excess determination before a gather takes place. *See id.* at 735 ("[T]he possibility that further consideration will actually occur before the [p]lan is implemented is not theoretical, but real."). By its decision in 2009, this Court ordered BLM to comply with the Wild Horse Act and to remove only those horses deemed in excess, as the statute commands. *CWHBC I*, 639 F. Supp. 2d at 98. BLM is bound by the Court's order.[9] Indeed, BLM states that "the excess determination may be made in the gather plan and supporting NEPA document" and further that "it is particularly appropriate to make the excess determination in the gather plan because circumstances on the range may have changed since the planning document was issued." Defs.' Reply [Dkt. 56] at 22.

Third, a determination of whether the Court would benefit from further factual development of the issue also weighs in favor of finding that the decision is not yet ripe for review. It would be premature for the Court to rule on the validity of the 2005 Decision Record in the absence of a specific gather plan, which must include an excess determination if the plan directs removal of any horses. Further factual development is necessary prior to the Court's review of any future decision to gather the horses.

Plaintiffs' interests in the West Douglas Herd are protected. The Court reminds BLM, as it noted in 2009, that the statute also commands a specific priority for the removal of excess animals and authorizes removal only of those necessary "to preserve and maintain a thriving natural ecological balance and multiple-use relationship in that area." 16 U.S.C. § 1332(f). BLM has a difficult task and balance to maintain among different kinds of wild animals and human endeavors on public lands. The difficulty of the task, however, cannot allow

---

[9] BLM initially filed a notice of appeal, but then voluntarily moved to dismiss. The appeal was dismissed. *See* Order [Dkt. 109].

a disregard of the strictures of the Wild Horse Act.  The Court's 2009 decision imposes a legal constraint on the White River Resource Management Plan as embodied in the 2005 Decision Record.  If BLM issues a specific gather plan that includes the removal of any horses from the West Douglas Herd, BLM is required to make a prior reasonable excess determination.  Because only BLM's 2005 Decision Record and not a specific gather plan is before the Court, the case is not ripe for review.

BLM's motion for summary judgment [Dkt. 47] will be granted.  Plaintiffs' motion for summary judgment [Dkt. 45] will be denied.  Defendant-Intervenors' motion for summary judgment [Dkt. 49] will be denied as moot.  The Complaint [Dkt. 1] will be dismissed for lack of jurisdiction.


Date: September 13, 2012                            /s/
                                          ROSEMARY M. COLLYER
                                          United States District Judge